

**U.S. Department of Justice**

_____

July 4, 2026

<u>By ECF</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:     United States v. Gautam S. Adani et al.
               <u>Criminal Docket No. 24-433 (NGG)</u>

In its Order dated June 26, the Court directed the Department of Justice to provide the bases for seeking dismissal with prejudice of all charges against all defendants in this case. The Department responds as follows.

I.      <u>Judicial Inquisitions Into the Bases for Dismissal with Prejudice Will Tend to Cause Serious Unintended Consequences and Trigger Constitutional Concerns.</u>

The June 26 Order stated that the Department's dismissal motion was "terse, bland, and conclusory." Fair, but there are a host of reasons—both legal and pragmatic—why the Department's dismissal motions are typically terse. Although perhaps not imminently apparent, demanding more detailed explanations threatens a variety of harms to all involved, including the Court, and raises serious constitutional concerns.

      A.      <u>Judicial Inquisitions Hurt Those Facing Criminal Charges.</u>

Demanding the rationales for dismissal will hurt defendants—not just the defendants here, but untold other defendants in future cases—by potentially chilling the Department from seeking dismissal of criminal charges it determines are not in the interests of justice.

Charges are often dropped because the evidence is weaker than expected, which can happen for any number of reasons, often implicating information that would reveal a cooperating witness's identity, something that is privileged, or something that is sensitive or even classified. Sometimes the evidence has not changed at all but is instead reevaluated—exactly what a prosecutor should be encouraged to do. Sometimes the legal theory isn't as strong as initially believed, either because of developments in the law or reevaluations of existing law. Sometimes a case simply does not merit the time and resources as other cases, but the office does not want to undermine deterrence by publicly suggesting a larger shift in priorities. Sometimes the office might have staffing issues. Sometimes

1

charges against a set of defendants should be dismissed, but not against other defendants, and the government would have to reveal internal evaluations to differentiate the two. Sometimes dismissal is for some combination of these reasons, or other reasons altogether.

Further, whatever reason is given, defendants in other cases will start claiming—wrongly or rightly—that their case meets those same considerations, too, resulting in a wave of requests for dismissal in other cases, consuming significant Department resources.

Requiring the Department to explain to the Court why a case is not worthy of further resources thus almost certainly makes it less likely the Department seeks dismissal in future cases. If that happens, it will be to the detriment of criminal defendants. From their perspective, at worst, the prosecutors will not seek to dismiss at all, lest they have to expose weaknesses or internal debates to the Court. At best, the defendants' dismissals are held hostage while the Court conducts an inquisition. Those pending criminal charges impose significant restraints not only on defendants who have appeared and are thus subject to confinement or the restrictions of pretrial release, but also on defendants who have not appeared: those defendants are typically barred from traveling internationally, and they face significant familial and business strains while remaining under a cloud of suspicion. Those are expected and reasonable limitations on a defendant when there is an indictment—but there is no conceivable basis for continuing those restrictions when the Department wishes to dismiss the charges with prejudice, and the defendants agree.

Either way, defendants are the primary ones who suffer when Courts demand explanations for dismissal.

B.     Demanding the Reasons for Dropping Charges Will Expose Internal Department Debates, Which Are Almost Always Privileged.

Judicial inquisitions into the bases for dismissal will also expose privileged internal debates. Some Department lawyers may believe a case is worthy of continued pursuit, either in whole or in part; others may disagree. That is natural, and the internal debate is helpful and should be encouraged. But judicial inquisitions will chill those debates. That hurts defendants, as explained above, because it will discourage prosecutors from discussing whether to seek dismissal. But it also injures the Department and violates the separation of powers.

The ability to freely discuss the bases for making prosecutorial decisions—without those grounds being revealed outside the Executive Branch—is so important that it is recognized as an inherent aspect of Article II of the Constitution. The Supreme Court has held that executive privilege is "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." United States v. Nixon, 418 U.S. 683, 708 (1974). Although there is no "absolute, unqualified Presidential privilege" to prevent the disclosure of all privileged information, id. at 706, criminal charging and dismissal decisions fall in the heartland of information that the Executive Branch must be able to protect. The deliberative process component of executive privilege encompasses "advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated"—i.e., opinions and statements often made in the course of bringing and dropping criminal prosecutions. Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001).

As the Supreme Court has explained, "the valid need for protection" of such communications is "too plain to require further discussion." Nixon, 418 U.S. at 705. Forcing prosecutors to disclose

their deliberative rationale could compromise other ongoing investigations or reveal sensitive information. "[T]he Executive's ability to enforce the law would be seriously impaired … if the Executive were forced to disclose sensitive information on case investigations and strategy from open enforcement files." Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege, 8 Op. O.L.C. 101, 117–18 (1984). The Executive Branch accordingly has an Article II right to avoid disclosing "unpublished details of allegations against particular individuals and details that would reveal confidential sources, and investigative techniques and methods." Response to Congressional Requests for Information Regarding Decisions Made Under the Independent Counsel Act, 10 Op. O.L.C. 68, 77 (1986).

The only thing that can limit this Article II authority is another constitutional provision, not a statute or rule of criminal procedure. "[I]t is entirely clear," therefore, that the legal reasoning underlying a refusal to prosecute "cannot be the subject of judicial review," ICC v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 283 (1987), unless there is a basis to conclude there is a competing constitutional right, such a defendant's due process rights.

But all of this is lost when a Court launches an inquisition into the internal debates and reasoning of the Department. This would be akin to the Department demanding details about the underlying reasons why judges on an appellate panel denied discretionary relief with only a passing sentence. Those judicial discussions are protected by Article III. A rule of procedure—whether it addresses dismissals or subpoenas—can never trump constitutional privilege, and attempts to do so risk chilling honest discussions.

Relatedly, these judicial inquisitions put certain Department officials in an untenable position. The U.S. Attorney may feel compelled to defend the initial decision to bring a case, even if it was done by a predecessor, because the line attorneys who worked on it are still in the office, or because those attorneys were told by former leadership to bring the case. But the U.S. Attorney also answers to the Office of the Deputy Attorney General, which may view a case in a new and clearer light. When forced to respond to a judicial inquisition, should the U.S. Attorney come in and criticize the case his line attorneys brought, in accordance with the direction of his supervisors? Should he defend it, in accordance with the preferences of the attorneys who brought the case? Oftentimes the only workable solution is a "terse, bland, and conclusory" dismissal.[1]

Courts should recognize and accept those "terse" statements as the product of extensive internal review, rather than assuming irregularity and launching judicial inquisitions.

C.     Judicial Inquisitions Risk Giving the Impression the Court Is Performing Executive Functions.

Forcing an explanation for dismissal may also reflect poorly upon the Court by drawing it into an exclusively Executive determination.

Rule 48(a) provides that "[t]he government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). The Supreme Court has held that "[t]he principal object of the 'leave of court' requirement" is "to protect a defendant against prosecutorial harassment."

---

[1] For that reason, and also because I was the final and sole decisionmaker to seek dismissal of the charges here, I have not asked the U.S. Attorney or any other attorney to sign this submission. Mr. Nocella and his team have been exceedingly professional and supportive throughout this process.

<u>Rinaldi v. United States</u>, 434 U.S. 22, 29 n.15 (1977); <u>see United States v. HSBC Bank USA, N.A.</u>, 863 F.3d 125, 140–41 (2d Cir. 2017); <u>see also Blackledge v. Perry</u>, 417 U.S. 21, 25–27 (1974) (discussing prosecutorial vindictiveness as a potential due process violation). In other words, the proper role for the judiciary here is exceedingly narrow and focused on the defendant's constitutional rights. That makes sense given that, as discussed above, the Executive's bases for dismissal are privileged under the Constitution, meaning only another constitutional provision can possibly limit it.

Reading a broader "public interest" standard into Rule 48(a) so that the Court can grade or second-guess the prosecutorial discretion of the Executive would be unconstitutional under Article II of the Constitution. "Judicial supervision in this area … entails systemic costs of particular concern" given that the decision to pursue a prosecution turns on factors only a politically accountable branch can determine, like "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." <u>Wayte v. United States</u>, 470 U.S. 598, 607–08 (1985). "The Presidential power of prosecutorial discretion is rooted in Article II, including the Executive Power Clause, the Take Care Clause, the Oath of Office Clause, and the Pardon Clause." <u>In re Aiken County</u>, 725 F.3d 255, 262 (D.C. Cir. 2013) (Kavanaugh, J.). Under our Constitution, "the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." <u>Nixon</u>, 418 U.S. at 693. That includes the "indubitable" power to "direct that the criminal be prosecuted no further." <u>Aiken County</u>, 725 F.3d at 263 (Kavanaugh, J.); <u>see Trump v. United States</u>, 603 U.S. 593, 620 (2024) ("Investigation and prosecution of crimes is a quintessentially executive function. And the Executive Branch has exclusive authority and absolute discretion to decide which crimes to investigate and prosecute….") (cleaned up).

Thus, "settled constitutional understandings" provide that "authority over criminal charging decisions resides fundamentally with the Executive, <u>without the involvement of—and without oversight power in—the Judiciary</u>." <u>United States v. Fokker Servs. B.V.</u>, 818 F.3d 733, 741 (D.C. Cir. 2016) (emphasis added). "[T]he Supreme Court has declined to construe Rule 48(a)'s 'leave of court' requirement to confer any substantial role for courts in the determination whether to dismiss charges," and accordingly a court should not deny the government's motion to dismiss "based on a disagreement with the prosecution's exercise of charging authority" or with the prosecution's determination that further proceedings "would not serve the public interest." <u>Id.</u> at 742-43.

Given all this, respectfully the Court's June 26 Order incorrectly frames the Rule 48(a) inquiry. It is not a "sunshine" provision requiring that information be provided simply for judicial interest or grading (notably, the June 26 Order does not cite any Second Circuit or Supreme Court case holding to the contrary). The Court cannot inquire into whether the basis for dismissal was "good enough." That is a determination entrusted exclusively to the Article II Executive. At most, in appropriate cases, the Court can inquire only into whether the ground for dismissal is among one of the very few disallowed grounds—primarily, whether dismissal would affect defendants' due process rights—but anything further will inevitably draw the Court into an Article II determination it lacks authority to make.

But even that narrow test is narrower still where the defendant does not oppose dismissal. A district court may deny an unopposed motion to dismiss, if at all, only in an extraordinary case where a rogue prosecutor appears to be acting without "the approval of the Justice Department." <u>In re United States</u>, 345 F.3d 450, 453–54 (7th Cir. 2003). The Second Circuit has likewise indicated that it may inquire into whether "the prosecutor appears motivated by bribery, animus towards the victim, or a

desire to attend a social event rather than [the] trial," i.e., indications of a prosecutor acting without authority. HSBC Bank, 863 F.3d at 141. That is not a substantive inquiry about the reasons for the Executive's dismissal, but rather to determine whether the prosecutor "is acting alone rather than at the direction or with the approval of the Justice Department." United States, 345 F.3d at 454. Of course, that concern does not exist when the dismissal is signed by senior Department leadership.

That ultra-narrow inquiry is further constricted—likely to the point of being foreclosed altogether—where dismissal is both unopposed *and* with prejudice. No game is possibly being played when all charges are dismissed with prejudice. The government isn't waiting for key defense evidence to grow stale. There can be no cat-and-mouse ploy to keep a defendant constantly under indictment. And there is not even the prospect of *future* related charges being held over the defendants' heads. In such cases, a Court's refusal to swiftly grant dismissal imposes far more injury on the defendants than anything the Department has done or could do.

* * *

This explains why the Department typically files short dismissal motions, which Courts typically accept without controversy.[2] That is even more obvious when dismissal is with prejudice, where there is no conceivable basis on which dismissal could injure the defendant.

II.     In a Limited Waiver of Privilege, the Department Will Explain Why the Charges Were Dropped.

As explained above, the rationales for dismissing the charges in this case are protected by privileges of a constitutional dimension. The Department is constitutionally entitled not to provide those bases, especially given that the charges here are sought to be dismissed with prejudice, and there is no conceivable countervailing constitutional interest held by any defendant in this case. Indeed, they all readily consent to dismissal.

The Court's June 26 Order suggests that granting dismissal based on the as-filed motion could be an abuse of discretion. That is wrong. Judges of this Court have routinely granted dismissals on similar or even shorter motions, as noted above. Further, as explained above, it is an encroachment on the separation of powers for the Court to demand further information about the dismissal, and it is likewise problematic to hold defendants' dismissals hostage while the Court questions an outcome all parties have agreed is appropriate and from which no party can possibly be harmed. In other words, respectfully, the only risk of committing an abuse of discretion would arise from launching an inquiry into a consent dismissal motion with prejudice, rather than simply granting it.

But because the Court has demanded an explanation, and because the dismissal motion has been pending for far too long, I am hereby granting a limited waiver of the relevant privileges to explain why I moved to dismiss all charges. The waiver extends only to the remarks in this filing and does not in any way extend to or imply any other waivers, either in this case or others.

---

[2] E.g., United States v. Al Malik Alshahhi, No. 21-cr-371 (BMC) (E.D.N.Y. Nov. 26, 2025) (Dkt. 397) ("The Department of Justice has determined that it will not commit further resources to the prosecution of the one remaining defendant in this case"); United States v. Sindzingre, No. 2:17-cr-464 (JS) (E.D.N.Y. Mar. 29, 2023) (Dkt. 41) (no rationale given at all for dismissal); United States v. Angwang, 20 Cr. 442 (EK) (E.D.N.Y. Jan. 13, 2023) (Dkt. 138).

I ardently strove for months to avoid criticizing the case publicly, which could inevitably come across as criticism of the line attorneys who worked on the case. Almost all of them have been professionals who should not have their work publicly criticized by Department leadership. And that is a key reason I insisted that we file a "terse, bland, and conclusory" dismissal motion. But the Court apparently views things differently and has demanded that we go down this alternative path.

A.    <u>Overlapping Bases for All Charges.</u>

This white-collar case was indicted in late 2024 without first hearing from defense counsel. Before I began in the Office of the Deputy Attorney General in January 2026, I had never heard of any of the defendants in this case. Some of the defense counsel requested a meeting to discuss the case and why it should be dismissed. I made the decision to dismiss these charges after conducting numerous meetings with defense counsel (two of which featured a dozen-plus attorneys) and also separate meetings with only Department counsel, after reviewing hundreds of pages of materials prepared both by defense counsel and by Department counsel in response to questions I raised, and after conducting my own research and analysis.

The charges in this case can be put into two buckets: (a) the securities and related fraud charges against three defendants; and (b) the Foreign Corrupt Practices Act and related charges against the other five defendants. Both buckets share numerous important bases warranting dismissal, any one of which would have been sufficient but taken together made clear the entire case must be dismissed. The decision to seek dismissal was not a close call.

The overlapping bases are:

(1)    This is a foreign case. The first two pages of the indictment tell the story: several **Indians** (with maybe a European or two) allegedly tried to bribe other **Indians** by paying the **Indian** government via complex **Indian** rebate programs to get **Indian** contracts to provide **Indian** electricity to **Indians** in **India**. Ctrl-F "India" in the indictment, and it'll show well over 200 hits. The United States pretending to be the world police can cause diplomatic strife and also wastes resources better spent on domestic concerns. India can better manage its internal systems than can prosecutors in Brooklyn and Washington.

(2)    On that topic, India has investigated many of the allegations in this case and in several reports and decisions issued in 2026 has found no actionable misconduct. See attached documents from India, which I reviewed before filing the dismissal motion. So the country with by far the strongest interest here seems to have concluded nothing inappropriate happened.

(3)    Not a single penny has ever been lost on the securities at issue. Two of the notes are fully paid back, and the other two notes are currently paid up, with no indication of any change ahead.

(4)    The indictment was unsealed in the final days of the prior Administration, apparently as a "name and shame" designed to levy accusations without any realistic prospect of a trial ever occurring. Department leadership at the time was surely aware they were dropping a potential quagmire of a case into the lap of the incoming Administration, and perhaps that was an intentional choice.

(5) There would have been extraordinary proof problems in this case, not least because significant evidence and key witnesses are in India, which—as explained above—has found no actionable misconduct.

(6) The defendants have never appeared and probably never would. They are all foreign nationals who live abroad in locations that offer no reasonable prospect of arrest. That also means that, 18 months after indictment, no proceedings have taken place. There should have been no judicial concern about dismissing a case that has never proceeded past an indictment.

Any of these bases was enough to dismiss all charges. But there's more. As explained below, there were also charge-specific bases for dismissal.

B.    Group A: Securities Charges against G. Adani, S. Adani, and Jaain.

Where to begin. The securities charges should never have been brought. They are failed FCPA claims (which could not be brought against these three particular defendants on these facts) that were spun into securities charges.

As explained above, the alleged misconduct in this case occurred almost entirely in India. That raised significant legal risks for the securities charges in particular given the jurisdictional limitations of the relevant securities laws. Setting aside securities traded on a domestic exchange, a transaction can qualify as "domestic" only if "either (1) the purchaser must have incurred irrevocable liability within the United States to take and pay for a security, or the seller must have incurred irrevocable liability within the United States to deliver a security, or (2) legal title to the security must have transferred in the United States." In re Petrobras Sec., 862 F.3d 250, 262 (2d Cir. 2017) (cleaned up). Neither of those happened here. The alleged bribery scheme was carried out by Indian nationals on behalf of an Indian company listed on the Indian stock exchange to Indian government officials for Indian contracts. The alleged false statements in securities filings were made outside the United States, and the securities were sold in the first instance to purchasers outside the United States. The limited connections to the United States would pose a substantial risk both at trial and on appeal. The cases I relied upon in forming that conclusion include: Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247 (2010); In re Petrobras Sec., 862 F.3d 250 (2d Cir. 2017); Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings, 763 F.3d 198 (2d Cir. 2014); Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012).

Further, the legal theory for fraud here is so broad that it arguably turns any undisclosed corporate misconduct into criminal securities fraud. Of course, "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 184 (2d Cir. 2014). And the allegedly false statements here consisted primarily—perhaps exclusively—of platitudes about following laws, not being bribers, and being upstanding. The Second Circuit has agreed that "general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to reply upon them." Boston Retirement Sys. v. Telefonaktiebolaget LM Ericsson, 2024 WL 4023842, at *3 (2d Cir. Sept. 3, 2024) (quotations and citations omitted). In fact, in the Boston Retirement System case, the Second Circuit focused in particular on whether a company's participation in a bribery scheme rendered its statements about the efficacy of its

compliance program materially misleading, and held that generalized statements about "the effectiveness of [a company's] compliance program" are "non-actionable expressions of puffery and corporate optimism that do not give rise to securities violations." Id. at *6.

Also, because the alleged "victims" here were some of the most sophisticated financial entities on Earth, the prosecution would likely have to prove not that any ordinary investor would have found the alleged misrepresentations material, but that these sophisticated investors would have found the alleged misrepresentations material. The financial instruments were first transferred to highly sophisticated foreign-owned underwriters, which in turn sold them to qualified institutional buyers ("QIBs"), which are super-majority foreign-owned and also extremely sophisticated. The QIBs then allegedly resold some portion to sophisticated U.S. investors. It would have been difficult to prove that those ultra-sophisticated investment entities were tricked by what were platitudes in the offering materials, let alone to the point of this being a criminal securities case. And even if those uber-sophisticated investment entities were misled, they ultimately never lost a penny, because the notes have all been repaid (or are still being repaid) in full.

Given all this, the allegations here would be appropriate for a civil resolution at the very most. The prior Administration brought a civil case based on the same facts. That case was settled earlier this year. Again, by that time I had already resolved to dismiss the securities charges no matter what. But given that there were no victims who suffered any losses, the resolution of that civil case made it even more obvious that there was no point in pursuing criminal securities charges for the same conduct. Even if the criminal case were to continue, no victim would stand to recover any restitution, because there were no losses to recover.

The Department should be credited for ending these criminal security charges before having to endure a likely loss on the merits, perhaps after years of trials and appeals (assuming there ever was a trial—an admittedly remote prospect). Again, for all the reasons above, these are the sorts of determinations that the Department should be entitled to keep privileged rather than bare for public inspection.

C.      Group B: FCPA Charges Against Gupta, Cabanes, S. Agarwal, Malhotra, and R. Agarwal

Once I determined the security charges should be dropped, I turned to the FCPA charges. Before I could undertake a full review, however, a Department attorney unethically leaked to the media that the Department planned to dismiss the securities charges. Once that story broke, I was contacted by defense counsel for the FCPA defendants, contending they would oppose any dismissal of the securities charges if the FCPA charges were not also dismissed. Their professed opposition played no role in my decision to dismiss either set of the charges; that decision would be made based on the merits, not on whether it would prompt opposition or scrutiny. I continued my review of the FCPA charges and engaged in several meetings with defense counsel to discuss them.

It became clear that the FCPA charges must be dismissed because they do not satisfy the Blanche Memorandum, which was issued by Deputy Attorney General (now also Acting Attorney General) Todd Blanche on June 9, 2025. *See Guidelines for Investigations and Enforcement of the Foreign Corrupt Practices Act (FCPA)*. The Blanche Memorandum set a Department-wide policy that FCPA prosecutions, including those already pending, focus on "targeting enforcement actions against conduct that directly undermines U.S. national interests." In particular, the Blanche Memorandum directed prosecutors to focus on cases involving payments to drug cartels and transnational criminal

organizations, cases that safeguarded fair opportunities for U.S. companies, cases that advanced U.S. national security interests, and cases involving serious misconduct. As part of their considerations, "FCPA prosecutors should also consider the likelihood (or lack thereof) that an appropriate foreign law enforcement authority is willing and able to investigate and prosecute the same alleged misconduct."

But here, the alleged conduct did not involve criminal organizations, did not have any effect on U.S. companies, did not in any way implicate national security, was not egregious, and has been the subject of investigations in India. The alleged "payments" in this case were made by Indian nationals, working for Indian companies, to the Indian government, with no U.S. interests implicated in any way. The FCPA charges here therefore do not plausibly satisfy any of the bases given in the Blanche Memorandum for FCPA charges worthy of proceeding. Under the Blanche Memorandum, the FCPA charges should have been dismissed a year ago.

Further, it is entirely unclear that the prosecution could prove that the alleged payments in this case were not legitimate commercial transactions. The payments could be characterized as customer rebates, which are a common and acceptable commercial practice.

As for the tagalong obstruction charges, the indictment's theory makes little sense. The indictment (paragraph 76) alleges that some of the defendants who allegedly committed obstruction also hired extremely expensive law firms to conduct thorough investigations that implicated the most high-profile defendants while downplaying the role of lower-profile individuals. Not exactly the most obvious way to commit obstruction, to say the least.

D. Non-Considerations

There have been stories in the media about the Department's motion to dismiss the securities charges in this case. I assume the Court would never give credence to breathless reporting relying on anonymous sources. But in an abundance of caution, I address them here.

The current or former Department attorneys who unethically fed those stories have suggested that I sought dismissal of the securities charges at least in part because of some promise by those defendants to invest money in the United States. That is false. Before that topic first arose, I had already firmly concluded I would seek dismissal of the securities charges no matter what, because they were so indefensible. To put a finer point on it: I would have sought dismissal of the securities charges regardless of any mentions of investments, regardless of whether the civil case (or any other matter) was settled or otherwise resolved, regardless of whether the other defendants consented, and regardless of what leakers might try to spin up in the media.

Also, even setting that aside, it is risible to suggest that the Managing Partner of Sullivan & Cromwell, who is perhaps the most respected and experienced securities attorney in the country, would propose any kind of improper resolution, let alone one crafted in a meeting with over a dozen attorneys present, including from other law firms. In a pitch to have charges dismissed, it would have been entirely fair to point out that the defendants have been effectively frozen out of the United States and its financial system for 18 months because of the pending indictment, and also that they had publicly and expressly indicated a desire to invest in the United States even before the prior Administration publicly unveiled its name-and-shame indictment. But again, although such a factor would be entirely fair to consider, I had already resolved beforehand to dismiss the securities charges, and accordingly the mention of potential investments could not have played any role.

Some current or former Department attorneys may disagree with the decision to drop these charges. But it is improper and unethical to leak about the case and thereby attempt to affect its disposition before the Court. Whether to drop a prosecution is not a game—it is an important decision that affects people's lives. The debate should not be fought through the media in a proxy battle designed to influence the Court. In the end, however, the anonymous leakers stepped on their own landmine: the only thing they have achieved was the submission of this public rejoinder explaining in detail the numerous catastrophic flaws with their case.

\* \* \*

The Constitution vests the prosecutorial power in the Executive, not the Judiciary. The Department should be commended for professing that a criminal case is unworthy of further resources, without having to publicly catalogue the reasons why. Thus, despite spending well over a hundred hours reviewing and debating this case, I insisted the dismissal motion be "terse, bland, and conclusory" to protect the interests of the Department, of the line attorneys who worked on the case, of the defendants here and in future cases, and of this Court, too, because providing an explanation of the reasons for dismissal gives the public the misimpression that the Court is authorized to undertake the exclusively Article II task of determining whether this prosecution should continue.

In short, there was absolutely nothing improper with the Department's as-filed dismissal motion, which has now been pending for six weeks, during which time the defendants have been held in limbo on charges that should have been dropped a year ago—or never brought in the first place. Nor was there anything improper about the underlying decision to dismiss these charges. It would, however, be a grave mistake to rely on media reports citing anonymous sources desperately hoping to give their flawed case one last gasp before it's buried.

FILED: July 4, 2026

Respectfully submitted,

 /s/

R. TRENT MCCOTTER
Principal Associate Deputy Attorney General[3]

cc:  Counsel of Record (by ECF)
Joseph Nocella (by E-mail)
Winston Paes (by E-mail)
Paul Schoeman (by E-mail)
Stephen Best (by E-mail)
Michael Kendall (by E-mail)
Iris Bennett & Patrick Linehan (by E-mail)

---

[3] As explained above, I have not asked the U.S. Attorney or any other attorney to sign this submission, given that (a) the dismissal decision was ultimately mine, and (b) the U.S. Attorney's office should not unnecessarily be put in the position of criticizing, even indirectly, the work of the line attorneys simply to justify the exercise of the Executive's prerogative power to dismiss these charges. I thank Mr. Nocella and his team for their professionalism.